743 So.2d 851 (1999)
Dennis Ray DeYOUNG, Plaintiff-Appellant,
v.
Gary Dean SIMONS, United Parcel Service, Inc. and Liberty Mutual Insurance Company, Defendants-Appellees.
No. 32,378-CA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
*852 Johnson & Placke by Don H. Johnson, West Monroe, Counsel for Appellant.
Mayer, Smith & Roberts, L.L.P. by Dalton Roberts Ross, Shreveport, Counsel for Appellees.
Before STEWART, PEATROSS & KOSTELKA, JJ.
PEATROSS, J.
Plaintiff, Dennis Ray DeYoung, filed suit against Defendants, United Parcel Service, Inc. ("UPS"), Gary Simons, a UPS driver, and Liberty Mutual Insurance Company ("Liberty Mutual"), alleging damages resulting from an automobile accident with Mr. Simons. Plaintiff was awarded $39,886 for personal injuries and medical expenses, which award he appeals as insufficient. For the reasons stated herein, we affirm.

FACTS AND PROCEDURAL HISTORY
On December 6, 1994, Plaintiff was stopped at a traffic light in the southbound right turn lane of Youree Drive at its intersection with Bert Koons Industrial Loop in Shreveport, Louisiana. As Plaintiff waited for the light to change, a UPS truck driven by Mr. Simons struck the rear of Plaintiff's car. Mr. Simons had depressed the clutch to move forward and was traveling approximately five to ten miles an hour when he struck Plaintiffs car. Plaintiff sought medical treatment for injuries he allegedly sustained in the accident.
On November 28, 1995, Plaintiff filed this suit. On February 28, 1997, the court granted a motion for summary judgment in favor of Plaintiff, finding UPS entirely at fault in the accident; and, on March 3, 1997, UPS and its insurer, Liberty Mutual, stipulated their responsibility for the accident. Plaintiff dismissed his suit against Mr. Simons and quantum was the only remaining issue to be decided at trial. After a bench trial, the trial court awarded Plaintiff the sum of $39,886 against UPS and Liberty Mutual. The trial court's reasons for judgment indicate that this amount consists of $20,000 in general damages and $19,886 in special damages for past medical expenses. Future medical expenses and lost wages were not awarded.

MEDICAL EVIDENCE
Following the accident, Plaintiff allegedly suffered immediate neck pain.[1] Later *853 that day he went to the emergency room at Willis-Knighton Hospital where neck x-rays showed no fractures. The next day, Plaintiff saw Dr. Don Joffrion, an orthopedic specialist. Dr. Joffrion had previously treated Plaintiff for injuries sustained in a car accident in 1992, from which Plaintiff had apparently recovered completely. On December 7, 1994, Dr. Joffrion diagnosed Plaintiff with cervical and lumbar strain. Plaintiff was prescribed a muscle relaxant, codeine and prednisone and directed into a physical therapy program. Plaintiff began physical therapy and continued for about two weeks. He saw Dr. Joffrion again on January 4, 1995, at which time Dr. Joffrion found stiffness and soreness in Plaintiffs back, but found no evidence of sciatica. Dr. Joffrion treated Plaintiff again with prednisone and pain medicine and suggested further physical therapy. During this visit, Plaintiff told Dr. Joffrion's nurse that he had suffered some numbness on the right side of his face since the accident. On the next visit, February 22, Plaintiff complained of back and rib cage pain. Physical therapy was again recommended and Plaintiff was placed in an industrial back brace.
Plaintiffs last visit to Dr. Joffrion was on March 29, 1995. Plaintiff said that his neck was fine, but that he was unable to sit for long periods due to back pain. Dr. Joffrion instructed Plaintiff to take ibuprofen and to continue wearing his back brace. Dr. Joffrion stated he thought that Plaintiff had reached maximum medical improvement and that there was no further need for Plaintiff to see him on a regular basis.
On April 10, 1995, Plaintiff saw Dr. Gurleen Sikand, a neurologist, for treatment of facial numbness, which Plaintiff alleged to have resulted from the car accident. He reported that the numbness extended from his chin to the top of his skull, all on the right side of his face. Dr. Sikand first performed a standard pinprick test to determine the extent and area of Plaintiffs numbness. Dr. Sikand found that, according Plaintiffs responses, there was a clear line of demarcation down the center of Plaintiffs face, which, although not completely anatomically impossible, was very unusual. Dr. Sikand then performed a vibration test on Plaintiffs face with a tuning fork. The tuning fork is struck lightly to produce a vibration, then placed against the skin in the center of the forehead. Since the vibration is actually carried by the bones of the skull to the auditory bones of the ear and not transmitted by nerves, the sound heard in either ear should not change significantly when the tuning fork is moved either left or right from the center of the forehead. In fact, according to Dr. Sikand's testimony, if the sound changes at all, it should increase in the ear which is closer to the tuning fork. Dr. Sikand stated that when he moved the tuning fork to the right of Plaintiffs forehead, Plaintiff complained that he actually experienced a decrease in the sound in his right ear. Dr. Sikand opined that a person may experience a decrease of sound under those circumstances only if there was a bone abnormality in the skull, such as an actual hole, which interrupted the transmission of the vibrations. Since Dr. Sikand found these results to be unusual and found it difficult, if not impossible, to anatomically explain the symptoms of which Plaintiff complained, he ordered an MRI of Plaintiffs brain to rule out any unknown anomalies.[2] The MRI revealed no irregularities.
*854 Dr. Sikand found no anatomical explanation for Plaintiffs complaints and indicated that certain of Plaintiffs answers to questions during the examination "made me feel at least the problem may not be as clear cut and dramatic on the whole face as Dennis was telling me." Dr. Sikand prescribed Elavil for Plaintiff, but Plaintiff did not tolerate the medicine well, reporting that it made him forgetful, so that medication was discontinued. Plaintiff did not see Dr. Sikand again; and, on May 16, 1995, Dr. Sikand referred Plaintiff to Dr. Kevin Balter, a pain management specialist.
On March 28, 1996, Plaintiff saw Dr. Balter, complaining of pain in his chest and lower back and of numbness in the right side of his face and in all fingertips of his right hand. Plaintiff told Dr. Balter that he had been seeing a podiatrist for some time for a bone spur in his foot and for that problem he had been taking Naprosyn (naproxen), an anti-inflammatory drug which, as a positive side effect, reduced Plaintiffs other pain and numbness. Dr. Balter found that Plaintiffs back pain originated between the L-5 and S-1 vertebrae and that it might be caused by an inflamed, irritated or damaged ligament in that area and not damage to the spine itself. Dr. Balter testified that he felt this to be the case because he was able to reproduce Plaintiffs pain by applying pressure to that point on Plaintiffs back. Dr. Balter explained that pain from an injury to a disc could not be reproduced by mere palpitation of the area because a disc is much deeper and cannot be reached in that manner. Dr. Baiter recommended that Plaintiff continue to take Naprosyn.
On March 28, 29 and April 1, 1996, Dr. Balter performed "pulse radio wave therapy"on Plaintiff, a new therapy which Plaintiff professed gave him partial relief from the numbness in his face. On April 16, 30 and May 14, 1996, Dr. Baiter administered an epidural steroid injection, which Plaintiff reported offered temporary, but near-complete, relief of the numbness in his face. Unfortunately, Dr. Balter believed that this steroid therapy was unsafe to administer long term because it could cause significant adverse side effects and is also very expensive. Later in May, Plaintiff received further pulse radio wave therapy; and, by June 5, 1996, his last visit with Dr. Baiter, the numbness had been greatly reduced.
In his deposition, Dr. Balter described Plaintiffs back and chest pain during the course of treatment as "steadily ... resolving" and that this pain was "quite mild and tolerable." At each visit, Dr. Balter asked Plaintiff to rate the pain on a subjective scale with 0 as none and 10 as extreme; Plaintiff rated the pain at 0 on March 28 and as 3, or mild, on April 16, May 14 and June 5, 1996. Dr. Baiter stated that Plaintiff reported that neither his pain, symptoms or numbness had restricted his daily living nor had they disrupted his work or sleep.
On September 22, 1997, Plaintiff saw Dr. Austin Gleason, an orthopedic surgeon. Plaintiff complained to Dr. Gleason that he was experiencing low back pain when sitting or lying down, pain in his left thigh when walking and pain in his lumbar spine region and neck. Dr. Gleason found that Plaintiff had about a 70 percent normal range of motion in his back and neck. Dr. Gleason ordered an MRI of Plaintiffs lower back which, compared with an earlier MRI (the origin of which was unclear), showed some degeneration of the disc at L-5, S-1, with a mild bulge. Dr. Gleason found no nerve root impingement and did not, therefore, recommend surgery; instead, he recommended physical therapy and prescribed an anti-inflammatory drug.
Plaintiff commenced physical therapy and his range of motion improved to 80 percent of normal by November 7. By December 4, physical therapy had improved *855 his range of motion to "approaching normal." On December 5, Plaintiff saw Dr. Gleason again and reported "quite a bit of pain" and that he had gotten worse since his last physical therapy program. Dr. Gleason prescribed Darvocet for pain and gave Plaintiff a cortisone injection. An EMG nerve conduction test was also performed to discover any possible nerve damage, however, none was found. On December 23, 1997, Dr. Gleason had a long discussion with Plaintiff and stated to him that Plaintiff was, "theoretically," a candidate for lumbar fusion surgery to reduce the back pain. This surgery would involve the installation of a titanium cage on the vertebrae and the wearing of a rigid back brace for six months afterward. Dr. Gleason estimated the cost of the surgery and required treatment at $25,000 to $30,000. Plaintiff testified at trial that he had decided to have the surgery because he was not able to live with his back pain.
Dr. Gleason explained that the medical tests conducted on Plaintiff did not prove or disprove that the degeneration of Plaintiff's disc was caused by or related to the accident. He testified as follows:
There is no way to look at any of these tests and have anything tangible or scientific to say, yes, this is what caused it. So, you know, if, once again, based strictly on his history, that he wasn't hurt before, then, you would tend to lean towards a traumatic episode, but there is no way to be sure.
At Liberty Mutual's request, Dr. Carl Goodman, an orthopedic surgeon at Highland Clinic, reviewed Plaintiff's MRI and his medical records. Dr. Goodman testified that the September 1997 MRI did not reflect anything that would indicate an operation was necessary. Moreover, Dr. Goodman stated that Plaintiff's symptoms, including back pain, did not suggest that he was a surgical candidate; surgery would be indicated only if Plaintiff had "a nerve impingement or a pinched nerve or pressure on a nerve which would cause leg pain as opposed to back pain." At his deposition, Dr. Goodman testified as follows:
A: [B]ack surgery for back pain is highly unsuccessful.... I would think somebody like this with back pain as his primary complaint would have a 50/50 chance of getting better or worse. It's not very good odds for an operation.
Q: There are actually chances that you can get worse as a result of the back operation?
A: Of course.
Dr. Goodman explained that he would not operate unless he was "up in the 90 percent good or excellent result possibilities...." Dr. Goodman further said:
I don't think he has a surgical problem. I think he has some back pain, and I think he's always going to have some (sic) back. I think he's probably reached maximum medical improvement meaning I doubt there's any treatment that's going to change how he is today.
Plaintiff testified that his back hurts from the time he wakes up in the morning and that the pain worsens as he moves around. He said that he is still taking medication for the pain, but that the medication does not entirely relieve the pain. Plaintiff also testified that he cannot walk for more than about 100 yards without a burning sensation in his back, leg and buttocks, and that he can only sit in a chair for 30 to 45 minutes without pain. Employed as a contract specialist at the VA Medical Center, Plaintiff said that he has pain while doing his job, which requires him to work at a computer. Plaintiff further said that he is no longer able to enjoy shopping with his wife, because he cannot walk for long distances, and that he can no longer play tennis or other sports or go camping with his children. Plaintiffs wife confirmed that the pain has reduced her husband's activities, particularly with regard to playing with their children, shopping and yard work.
Plaintiff introduced into evidence a schedule of days and hours that he had missed from work which reflected that *856 Plaintiff missed 11 entire days and numerous partial days of work for a total of 220 lost hours between December 7, 1994, and February 9, 1998. Three of these missed daysimmediately after the accident were due to pain, and the others were missed due to various doctor or therapy appointments. Plaintiff estimated that he would miss between three and six months of work if he had the back operation.
The trial court summarized all of the evidence in its reasons for judgment and, before making the damages award, observed that, "Although Mr. DeYoung complains of continuing back pain, that pain is not totally substantiated by medical evidence."

DISCUSSION
On appeal, Plaintiff raises two specific complaints in furtherance of his argument that the trial court's award was too low first, that the general damages award of $20,000 was grossly inadequate in light of his pain and suffering; and, second, that the trial court should have awarded him damages for future medical expenses and lost wages.

General Damages
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment or other losses of lifestyle which cannot be measured exactly in monetary terms. Robbins v. State ex rel. Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991; Sallis v. City of Bossier City, 28,483 (La.App.2d Cir.9/25/96), 680 So.2d 1333, writ denied, 96-2592 (La.12/13/96), 692 So.2d 376; 96-2599 (La.12/13/96), 692 So.2d 1063.
The trial court has much discretion in the assessment of damages in tort cases. La. C.C. art. 2324.1. The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence, most favorable to the plaintiff, which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
We conclude that the $20,000 general damage award was not an abuse of the trial court's great discretion. Although Plaintiff has been engaged in a prolonged course of therapy, Dr. Joffrion, who treated Plaintiff initially, found that he had reached maximum medical improvement for his back pain by March 29, 1995, meaning that the cervical and lumbar strains had been resolved. Plaintiffs complaints of back pain were self-described as mild for a long period after this date; and, in 1996 Dr. Balter described the pain as "steadily resolving" and "quite mild and tolerable." Plaintiff did not testify that the pain was sufficiently severe to cause him to miss work other than the three days immediately following the accident. Physical therapy, completed in 1997, improved *857 Plaintiff's range of motion to "approaching normal."
In 1995, Dr. Sikand was unable to relate Plaintiff's complaints of numbness to any physiological cause and found that Plaintiffs subjective complaints were inconsistent with the results of the objective tests. An EMG test conducted by Dr. Gleason in 1997 found no nerve damage. The 1997 MRI revealed some degeneration in Plaintiffs L-5, S-1 disc that Dr. Gleason was not scientifically able to link to the accident, other than by Plaintiffs self-reported history. The trial court's conclusion that the medical evidence "did not totally substantiate" Plaintiffs complaints is amply supported by the record. After careful review of the entire record, we find no abuse of discretion in the award and do not find it necessary to make a comparison with similar cases.

Future Expenses
This court stated in O'Riley v. City of Shreveport, 30,107 (La.App.2d Cir.1/23/98), 706 So.2d 213, writ denied, 98-0752 (La.5/1/98), 718 So.2d 418:
In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Stiles v. K [Mart Corp.], 597 So.2d 1012, 1013 (La. 1992). It is well settled that future medical expenses, like any other element of damages, must be established with some degree of certainty. See Sikes v. McLean Trucking Co., 383 So.2d 111 (La.App. 3rd Cir.1980). Also, "... awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable cost." Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La. App. 3rd Cir.1991); Holliday v. United Services Auto. Ass'n, 569 So.2d 143, 146 (La.App. 1st Cir.1990).
Again, we find no evidence that the trial court abused its discretion by not awarding damages for future medical expenses or lost wages. Two doctors speculated about the necessity for future surgery Dr. Gleason and Dr. Goodman. Dr. Gleason said that "theoretically" Plaintiff "might be" a candidate for back surgery using the most modern techniques. Dr. Gleason explained that this surgery is generally the last option after other therapy fails. Dr. Goodman emphatically stated that Plaintiff was not a candidate for back surgery, partly because he had no pinched nerves, that back surgery for pain was "highly unsuccessful," and that he doubted any treatment would change Plaintiffs condition. As early as 1995, Dr. Joffrion believed that Plaintiff had reached maximum medical improvement.
In light of this testimony, the requirement for future medical treatment, particularly surgery, is speculative at best. Future medical expenses must be proven with a degree of certainty, and the medical evidence simply does not support an award of damages for future medical expenses or attendant lost wages. There is clearly no abuse of discretion in the trial court's ruling.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Plaintiff, Dennis Ray DeYoung.
AFFIRMED.
NOTES
[1] Mr. Simons testified that Plaintiff appeared uninjured initially; but, on returning to the scene after calling his wife, Plaintiff began holding his neck and complaining of pain.
[2] Dr. Sikand testified that there are three nerves that innervate different regions of the face. These three nerves branch from a larger nerve which emanates from the pons at the base of the brain. He explained that in order to have total facial numbness from the top of the skull to the chin, all three nerves on that side of the face would have to be damaged, or the main nerve would have to be damaged. Given Plaintiff's narrative of the events which occurred during the accident, it is not possible for Plaintiff to have damaged the nerves in that manner. Dr. Sikand further testified that there would not normally be a clear demarcation of numbness down the center of the face. There would instead be "gray" areas where the sensation may be decreased, but not completely numb.