763 So.2d 811 (2000)
Ernest M. HUNT, Individually and on Behalf of His Minor Daughter, Kimberly Hunt, Plaintiff-Appellee,
v.
Troy LONG, Vic Transport, Inc., and Reliance National Indemnity Insurance Company, Defendants-Appellants.
No. 33,395-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
*813 Aubert & Pajares, L.L.C by Christopher J. Aubert, James P. Meyer, Paige F. Rosato, Metairie, Counsel for Appellants.
Johnson & Placke by Allan L. Placke, West Monroe, Counsel for Appellee.
Before GASKINS, CARAWAY and DREW, JJ.
GASKINS, J.
The defendants appeal from an adverse trial court judgment which they contend awarded a teen driver excessive general and future medical damages after she was injured in an auto collision with a jackknifed tractor-trailer rig. They also claim that the trial court erred in ruling on the admissibility of a post-accident photo of the plaintiffs car and in failing to take action over a statement made by plaintiffs counsel in closing argument. For the reasons assigned below, we reduce the future medical benefits to $34,916.00; in all other respects, we affirm the judgment of the trial court.

FACTS
On April 30, 1996, Kimberly Hunt, age 17, was driving her father's truck south on Highway 34 in Ouachita Parish when a *814 northbound tractor-trailer rig driven by Troy Long, an employee of Vic Transport, Inc., jack-knifed in her path. She was unable to avoid colliding with the rig. Kimberly was transported by ambulance to Glenwood Regional Medical Center in West Monroe. She was treated for a dislocated left hip, a torn medial meniscus in the right knee, and lacerations and contusions to her hands, legs and elbow. A closed reduction was performed on her hip. Later that day, she was transported to Lincoln General Hospital and kept for observation for a few days. There she was treated by Dr. Richard Ballard, an orthopedic surgeon.
On or about May 30, 1996, Dr. Ballard performed arthroscopic surgery to repair Kimberly's knee. She was on crutches for several months after the surgery, and she remained under Dr. Ballard's care for approximately 16 months after the accident.
In July 1996, Kimberly's father, Earnest M. Hunt, filed suit against Long, his employer, and Reliance National Indemnity Insurance Company.[1]
Liability on the part of the defendants was stipulated, and jury trial was held on September 1 and 2, 1998, on damages only. The jury awarded a total of $200,000.17 in damages in favor of Kimberly. This included $13,315.17 in past medical expenses; $41,000.00 in future medical expenses; and $145,685.00 in general damages. Judgment was signed September 24, 1998.
On October 1, 1998, the defendants filed a motion for JNOV or, alternatively, new trial or remittitur. On December 17, 1998, the trial court filed a minute entry and order in which it stated that it had denied the motions for JNOV and new trial and that only the remittitur remained. The court did not alter the award for past medical expenses but reduced the award for future medical expenses to $20,500.00 and the general damages award to $35,000.00. On December 22, 1998, the trial court filed a second minute entry and order in which it sought to "clarify and/or amend" its previous one. It stated that the awards "should be reduced" and ordered the plaintiffs to indicate within 30 days whether they consented to the remittitur and/or submitted to the granting of a new trial.
On January 11, 1999, the defendants filed a motion for new trial. On January 12, 1999, the trial court filed a third minute entry and order in which it vacated and set aside its prior two minute entries and orders on the basis of "inadvertent procedural errors committed by this Court and/or ambiguous misunderstandings as to this Court's intended ruling[s] relative" to its prior minute entries and orders. The court then gave the defendants 15 days in which to apply for reconsideration of their prior motions.
The plaintiffs sought review of the trial court's actions by supervisory writs. On January 20, 1999, the defendants applied for reconsideration of its motion in the trial court. On January 22, 1999, the appellate court granted the plaintiffs' writ and vacated all judgments and orders rendered after October 1, 1998; the defendants' motion filed on October 1, 1998, was deemed to be still pending. The plaintiffs sought a rehearing before the court of appeal, which was denied. The Louisiana Supreme Court denied their writ application on March 19, 1999, on the basis that the issue could be re-raised on appeal in the event of an adverse judgment.
On June 4, 1999, the trial court denied the defendants' motion for JNOV, new trial and remittitur; judgment was signed June 23, 1999. This appeal by the defendants followed.

GENERAL DAMAGES
The defendants contend that the jury abused its discretion by awarding excessive *815 damages, specifically general damages and future medical expenses. They argue that the evidenceboth medical and lay established that Kimberly's injuries were not severe and that they essentially resolved within 16 months of the accident. Thus, they contend that the award of $145,685.00 in general damages was grossly excessive. They also maintain that she failed to mitigate her damages by regularly participating in the physical therapy recommended by her doctor.
The plaintiff argues that the awards were not excessive in view of the evidence that she underwent two surgical procedures, sustained a 30% permanent disability to her right knee, and will require future surgery and lifelong medical care. She also notes the fact that she has permanent scars on her legs and that her athletic activities have been profoundly curtailed by her injuries. As a result of the accident, she also suffered depression and anxiety which prevented her from driving for a year after the accident. (She also suffered depression as a result of the death of a friend in an unrelated auto accident.) Her injuries precluded her from pursuing a career in the military or in the field of physical education. She maintains that, even if one accepts for purposes of argument that she failed to mitigate her damages, there is no evidence to suggest that such conduct aggravated her condition.

Law
The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn, supra.
Only after an abuse of discretion is disclosed by an articulated analysis of the facts is an examination of prior awards in similar cases proper; an abusively low award is raised to the lowest amount the trier of fact could have reasonably awarded, while an abusively high award is reduced to the highest amount the trier of fact could have reasonably awarded. DeYoung v. Simons, 32,378 (La.App.2d Cir.10/27/99), 743 So.2d 851; Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence, most favorable to the plaintiff, which reasonably could have been made by the trier of fact. Manuel v. State Farm Mutual Automobile Company, 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
Before a trial court's award of damages can be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case. Reck v. Stevens, 373 So.2d 498 (La.1979); Faulkner v. State, Department of Transportation and Development, 25,857 (La. App.2d Cir.10/26/94), 645 So.2d 268, writs denied, 94-2901 & 94-2908 (La.1/27/95), 649 So.2d 390. A damage award should not be disturbed by the reviewing court absent a showing of a clear abuse of discretion. Theriot v. Allstate Insurance Company, 625 So.2d 1337 (La.1993); Faulkner, supra.
General damages involve mental and physical pain and suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be measured exactly in monetary terms. DeYoung, supra.
Louisiana law requires that an injured person exercise the diligence and *816 care of a man of ordinary prudence to minimize his damages. The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages. The tortfeasor must demonstrate (1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm. Wilson v. Compass Dockside, Inc., 93-1860 (La. App. 4th Cir.3/15/94), 635 So.2d 1171, writ denied, 94-1527 (La.9/23/94), 642 So.2d 1299.

Discussion
Kimberly testified that she saw the oncoming tractor-trailer rig as it jackknifed into her lane of traffic. Vainly, she attempted to move out of its path by pulling to the side of the road. As she saw it advancing on her, the terrified teen "thought [she] was dead." After the collision, the steering wheel of her father's truck was up to Kimberly's chest and the dash was up to her knees. A man removed her from her truck due to fears that its gas tank might explode. She was laid on the side of the road while they waited for medical assistance to arrive at the rural scene of the accident. As she lay there on the ground for what felt like a lengthy period of time, she was unable to feel her legs, and this athletic, teenage girl feared that she was paralyzed. At the same time, she was also experiencing what she characterized as indescribable hip pain.
Kimberly suffered severe and painful injuries. Upon her arrival at the Glenwood Regional Medical Center, it was determined that she had sustained a dislocated hip. According to Dr. Ballard, this is a "devastating" injury. The ball portion of the hip joint is popped from its socket by a direct blow or a twisting-type injury. In order for the ball to come out of the socket, everything holding it in placemuscles, ligaments and blood vesselsmust be disrupted.[2] Kimberly was given pain medication so that an orthopedist could "reduce" or manipulate her hip so as to put it back in its socket.
Following the hip reduction, Kimberly was transferred to Lincoln General Hospital where Dr. Ballard undertook her care. She was briefly hospitalized there. When she was released to go home, she was unable to ambulate and was bedridden for several weeks. A high school junior, she returned to school for finals in a wheelchair.
At the end of May 1996, Dr. Ballard performed an arthroscopy on Kimberly's damaged right knee. He repaired a large tear of the lateral meniscus or the cartilage spacer between the femur and tibia. It was detached and moving around the knee in an abnormal fashion.
During the summer following the accident, Kimberly was tutored and attended physical therapy. At the suggestion of the physical therapists, her father got her a home gym. In July 1996, Kimberly saw a general practitioner on one occasion for depression. Her father was concerned because she was withdrawn and angry, cried frequently and seemed to have "given up." The doctor gave her a prescription for Prozac. However, due to the medication's unpleasant side effects, Kimberly quickly discontinued its use. Dr. Ballard testified that it was not uncommon for a person who had sustained the sort of serious injuries that Kimberly had to experience depression. Additionally, Kimberly did not drive an automobile for a year after the accident because she was afraid to do so.
At the beginning of her senior year, Kimberly was still on crutches. Formerly an avid athlete who jogged, power-lifted and water skied, she was unable to play on the school tennis team as she had previously. *817 Her injuries also restricted her Navy ROTC activities. Although she had seriously contemplated entering military service after high school, she was no longer capable of passing the mandatory physical training test due to her physical restrictions. Following high school graduation, she attended college for one semester on a disability grant. She intended to major in physical education and hoped to become a tennis coach. However, disheartened by the problems she was still experiencing with her knee and unaware of the procedures by which she could have sought accommodations for her disability, Kimberly dropped out of school.
At the time of trial, 19-year-old Kimberly was working in the cosmetics department at a Wal-Mart store. She testified that she was still unable to participate in many of the recreational activities she had enjoyed before the accident. In particular, she can no longer water ski, play tennis, run or jog. Her knee hurts and swells, and she cannot kneel or squat down on it. She has problems climbing stairs. Intermittently, she suffers hip pain.
Both Dr. Ballard and Dr. Brown agreed that Kimberly has a permanent disability as the result of the injuries she sustained in the accident. While Dr. Ballard had not personally calculated the actual degree of disability, he concurred with Dr. Brown's assessment of a 30% permanent disability of the knee. Both of these doctors felt that it was more probable than not that she would require another arthroscopic procedure on her knee in the future. While Dr. Ballard had encouraged Kimberly to try different activities to see if she was able to do them, he testified that this young woman had undergone notable changes in her athletic lifestyle as the result of the injuries she sustained in the accident.
The defendants contend that Kimberly's injuries were not severe and essentially resolved within 16 months. To the contrary, the doctors testified that her injuries were severe and life-altering. She also has permanent and disfiguring scars on her legs of which she is acutely self-conscious, especially in summer when she wears shorts. This young woman already suffers from arthritis in her hip and knee; the doctors indicated that condition will most likely worsen over time. While Dr. Ballard had noted in August 1997 that she was doing "amazing[ly] ... well," he nonetheless acknowledged that she will have lifelong consequences from this accident.
The defendants repeatedly attacked Kimberly's credibility on a number of details; however, these matters were essentially minutia. The jury obviously found her to be a credible witness, and we see no manifest error in that determination. The defendants also contended that she failed to mitigate her damages, most notably by not attending physical therapy exactly as prescribed. However, there was testimony from members of Kimberly's family that it was sometimes difficult to arrange transportation for her to physical therapy because of their work schedules. The physical therapy records do not indicate that Kimberly suffered any adverse effects as a result of her less-than-perfect attendance. Furthermore, Kimberly had a home gym which allowed her to do some exercises there. (She also testified that she attended physical therapy more often than the records indicated but she sometimes forgot to sign in.)
The trier of fact has "vast" discretion in awarding general damages and an appellate court may not disturb such an award in the absence of an abuse of discretion. While the general damages in the instant case appear to be on the high side, we are unable to say that they are abusively high given the particular severe and painful injuries sustained by this particular young, athletic plaintiff under the particular circumstances of this case involving a virtual head-on collision between her vehicle and the defendant's tractor-trailer rig.
The general damages portion of the trial court judgment is affirmed.

*818 FUTURE MEDICAL EXPENSES
The defendants also complain of the award of $41,000.00 in future medical expenses. Dr. Charles Bettinger, a forensic economist, testified that Kimberly would incur costs of $34,916.00, an amount $6,000.00 less than the amount awarded. The defendants contend that the evidence suggests that the estimate by Dr. Bettinger was elevated and, at any rate, the jury's even higher award suggests that it was not based upon the evidence.
The plaintiff asserts that the amount of future medical expenses awarded was well support by the evidence. The economist arrived at the amount of $34,916.00 by using the basic figures supplied by Dr. Ballard; these figures were lower than those given by Dr. Brown, who examined Kimberly in October 1997. Had the economist used Dr. Brown's estimates, the plaintiff argues, the future medicals would have been about $60,000.00.
An award for future medical expenses by nature is not susceptible of mathematical certainty. Like any other element of special damages, however, future medical cost or expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures more probably than not will be incurred. Coffin v. Board of Supervisors of Louisiana State University Agricultural and Mechanical College, 620 So.2d 1354 (La.App. 2d Cir.1993). The burden of proof in a claim for future medical expenses is a preponderance of evidence. Durkee v. City of Shreveport, 587 So.2d 722, 730 (La.App. 2d Cir.1991), writs denied, 590 So.2d 68 (La.1991); Coffin, supra. An award for future medical expenses will not be made absent medical testimony that they are indicated and setting out their probable cost. Killough v. Bituminous Casualty Corp., 28,329 (La. App.2d Cir.5/8/96), 674 So.2d 1091; Thompson v. Coates, 29,333 (La.App.2d Cir.5/7/97), 694 So.2d 599, writs denied, 97-1442 & 97-1521 (La.9/26/97), 701 So.2d 985, 987.
Both Dr. Ballard and Dr. Brown testified that Kimberly would require future treatment and medication throughout the rest of her life, particularly as she grew older. The doctors agreed that she would more probably than not require another arthroscopic surgery on her knee; Dr. Ballard estimated its cost at $6,000.00 while Dr. Brown said $10,000.00. Although Dr. Brown felt another MRI (which costs about $1,200.00) on her knee would be helpful, Dr. Ballard believed that it would not be necessary. The doctors concurred that she would require periodic medical attention and anti-inflammatory medication. Due to her injuries, she will more probably than not develop arthritis; in Dr. Ballard's opinion, "only time will tell" the degree of her arthritic condition. As her condition worsens over time, her medication expenses will increase. According to Dr. Brown, her monthly medication could cost about $70.00 to $75.00 and she would need to see an orthopedic doctor several times per year at about $100.00 per visit. Dr. Ballard estimated that she will probably need $300.00 annually for medications, plus follow-up appointments at least twice per year at about $75.00 per visit. She will also require hip x-rays once every year or two; he could not estimate the x-ray costs. Generally, Dr. Ballard felt that her annual medical expenses would be $450.00 to $500.00.
Neither doctor anticipated that Kimberly would develop avascular necrosis in connection with her hip injury. However, if that condition did develop, she would require a total hip replacement, which would cost about $20,000.00.
Dr. Bettinger, the plaintiff's economist, calculated that Kimberly's future medical expensesin present value dollars, after discountingwould be $34,916.00. In reaching this figure, he utilized Dr. Ballard's estimate of $500.00 per year in annual costs. He also included the one-time cost of the second arthroscopic surgery; for this procedure, he used $8,000.00, the *819 medium amount between the doctors' estimates of $6,000.00 and $10,000.00. He also took into account the youthful plaintiffs life expectancy of 61.4 years.
Considering the above, we find the award for future medical costs was clearly excessive. Therefore, we amend this award to the sum of $34,916.00, the amount supported by the record.

ADMISSIBILITY OF ACCIDENT PHOTO
As to the post-accident photo of the "demolished" Hunt vehicle, the defendants argue that since they conceded liability and did not contest the fact that Kimberly's knees were injured in the collision, the photo was irrelevant and cumulative of other evidence. They also argue that the force of impact does not determine the degree of injury. Furthermore, they assert that the photo's inflammatory prejudicial effect outweighed any probative value and the trial court should have refused to admit it into evidence.
The plaintiff argues that the photo of her wrecked vehicle was properly admitted as corroborating her testimony about the accident, particularly in light of the defendants' efforts to discredit her testimony in general. The plaintiff asserts that the photo tends to explain how she sustained the injuries she received in the accident.
Under La. C.E. art. 103(A), "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...." The jurisprudence interpreting the similar La. C.E. art. 103(A) holds that rulings on admissibility of evidence are entrusted to the broad discretion of the trial judge, and such rulings will be reversed on appeal only if a substantial right of a party is affected. Palmer v. Goudchaux/Maison Blanche, Inc., 588 So.2d 737 (La.App. 5th Cir.1991), writ denied, 590 So.2d 1186 (La.1992).
We find no error in the trial court's ruling that the photo was admissible. Furthermore, we find no prejudice which could have outweighed the probative value of the photo or otherwise adversely affected any substantial right of the defendants even if the photo were deemed irrelevant because of the stipulation to liability. Also, the two photos of the vehicle introduced by the defense during Kimberly's cross-examinationwhich showed the truck from a different angle and demonstrated the comparative lack of damage to the interior and the passenger side served to mitigate the effect of the other photo which showed only the driver's side.
As to the defendants' concern that the jury could have been improperly influenced by the photo and its depiction of the force of impact, we note that the trial court instructed the jury that "[t]he force of impact is not relevant one way or the other in determining the extent of damages." This instruction was adequate to negate the possibility of any improper inference by the jury.

CLOSING ARGUMENT
The defendants also complain about the trial court's action pertaining to a statement made by plaintiffs counsel in closing argument to the effect that Kimberly's injuries would affect her in the job market. The defendants objected and the trial court sustained the objection. However, the defendants argue on appeal that the trial court committed reversible error by failing to either strike the statement or give a cautionary instruction to the jury.
The plaintiff asserts that the defendants waived any error because they never requested any action by the trial court such as a cautionary instruction or striking the comment. She also maintains that the comment was appropriate since a factor to be considered in awarding general damages is whether the injury forced the plaintiff to pursue employment not of her voluntary choosing.
*820 The trial court sustained the defendants' objection during the plaintiffs closing argument. Thereafter, while generally instructing the jury prior to its deliberations, the trial court informed the jurors that "[s]tatements and arguments made by the attorneys for either side in their opening statements, their objections, their questions and closing arguments are not evidence. These are their opinions and nothing more." If the defendants desired any additional action by the trial court, it was incumbent upon them to request such. As they failed to do so, they have waived the matter. At any rate, we believe the above instruction was fully adequate to address the defendants' concerns.

CONCLUSION
The award of future medical benefits is amended to the sum of $34,916.00. In all other respects, the judgment of the trial court is affirmed. Costs are assessed against the appellants.
AMENDED AND, AS AMENDED, AFFIRMED.
CARAWAY, J., concurs in part and dissents in part with reasons.
CARAWAY, J., concurring and dissenting.
While I concur with the majority's other rulings, I respectfully dissent regarding the award for future medical expenses.
With plaintiffs 61.4 year life expectancy, the majority's award for future medicals suggests that it is now reasonably certain that at that far off future time plaintiff will be incurring $500 per year in medical treatment and medication for her knee. Nevertheless, in 1996 plaintiff spent only $55.66 on medication and $0.00 in 1997. In 1998, her cost for medical treatment was for a $40 visit to Dr. Ballard. This projection for possible future medical expenses, with possible arthritis pain and possible surgery, is much too general under the facts of this case. Consideration of these factors was more appropriate for the jury's award for general damages but far too speculative to support the award for future medicals which the majority now gives.
NOTES
[1] After Kimberly turned 18 years old, she was substituted as a party plaintiff; however, her father remained as a party plaintiff in his individual capacity, seeking damages for the loss of his truck and for lost wages. On January 27, 1999, Mr. Hunt and the defendants jointly dismissed his claims as compromised and settled.
[2] According to the medical evidence, a great concern with this sort of injury is the possibility that avascular necrosis, or blood disruption to the bone, will develop and necessitate a total hip replacement. Fortunately, at the time of trial the doctors felt that, while it was still a possibility, it was not probable that Kimberly would develop avascular necrosis.