949 So.2d 576 (2007)
Walter T. GRAVES, Plaintiff-Appellee
v.
RIVERWOOD INTERNATIONAL CORP., et al., Defendants-Appellants.
No. 41,810-CA.
Court of Appeal of Louisiana, Second Circuit.
January 31, 2007.
Rehearing Denied February 22, 2007.
*579 Bergstedt & Mount, by Thomas M. Bergstedt, F. Paul Leger, Brian W. Arabie, Lake Charles, for Defendants-Appellants.
LeBlanc & Waddell, L.L.P., by J. Burton LeBlanc, Cameron R. Waddell, Jeffery R. Nicholson, Jody E. Anderman, Baton Rouge, Baron & Budd, P.C., by Lisa White Shirley, Misty A. Farris, Baton Rouge, for Plaintiff-Appellee.
Before BROWN, WILLIAMS, and LOLLEY, JJ.
BROWN, Chief Judge.
On April 24, 2000, the original plaintiff, Walter Graves, upon being diagnosed with malignant pleural mesothelioma, a long-latency asbestos-related disease, filed the instant action against, inter alia, Riverwood International Corporation, the successor-in-interest to his former employers, alleging that his disease was caused by excessive exposure to asbestos and asbestos materials during his employment at the paper mill in West Monroe, Louisiana, from 1943 to 1986.[1] Upon Graves' death in June 2000, his widow and two adult daughters filed a supplemental and amending petition substituting themselves as parties plaintiff and adding as a defendant Olin Corporation.[2]
Until 1955, the West Monroe paper mill was owned and operated by the Brown family and was known as the Brown Paper Mill, Inc. Olin Corporation acquired the paper mill and related facilities in 1955. On January 1, 1967, Olin transferred the assets of its Forest Products Division, including the West Monroe Paper Mill, to Olinkraft, Inc., a separate legal entity owned entirely by Olin. Thereafter, on May 31, 1974, Olin transferred ownership of Olinkraft to Olin's shareholders and Olinkraft became an independent, publicly owned company. Later in the 1970's, Johns-Manville acquired the paper mill from Olinkraft in a hostile takeover. Sometime in the 1980's, the mill's name changed to Riverwood International Corporation and is now known as Graphic Packaging.
The matter proceeded to trial in July 2005. After an almost two-week trial, the jury returned its verdict with the following findings:
(1) Walter Graves had sustained an asbestos-related injury.
(2) Olin was negligent.
(3) A defective condition existed in the premises owned by/in the custody of Olin.
(4) Both were substantial contributing factors to the development of Graves' asbestos-related injury.
(5) These findings also applied to another company for whom Graves had worked, Brown Paper Mill.
(6) Olin had assumed the liability of Brown Paper Mill for the injuries and damages sustained by Graves.
(7) Olinkraft, J. Graves Insulation Company, Westinghouse, General Electric, and Johns-Manville Corporation were not at fault.
(8) Plaintiffs were entitled to general damages in the amount of $4,500,000 and medical expenses in the amount of $39,925.02.
*580 On October 26, 2005, judgment in accordance with the jury's verdict was rendered. Olin filed post-trial motions for judgment notwithstanding the verdict ("JNOV"), partial JNOV, remittitur, and, alternatively, a new trial. The motions were scheduled and oral arguments were held on February 13, 2006. On March 10, 2006, the trial court rendered judgment denying all of Olin's motions except its motion for remittitur, which the trial court granted by amending the general damage award to plaintiffs to $3,000,000 rather than the $4,500,000 awarded by the jury. It is from this judgment that defendant, Olin Corporation, has appealed.

Discussion
The overlying issue urged by Olin on appeal is that the trial court erred in denying its motions for directed verdict[3] and JNOV/new trial. However, the subissues raised by Olin on appeal (the grounds upon which these motions were based) must be addressed individually in order for this court to reach resolution of this appeal.
Applicable Legal Principles  JNOV and New Trial
A JNOV is a procedural device authorized by La. C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. The standard for granting or denying a JNOV is the same as that for a directed verdict  whether reasonable minds could differ. If so, then the motion should be denied. Cook v. Kendrick, 41,061 (La.App. 2d Cir.05/19/06), 931 So.2d 420, writ denied, 06-1853 (La.10/27/06), 939 So.2d 1284.
Louisiana Code of Civil Procedure article 1972(1) provides that a new trial shall be granted, upon contradictory motion, where the verdict or judgment is contrary to the law and evidence. Article 1973 provides that a new trial may be granted in any case if there is good ground therefor. The decision of whether to grant a new trial requires a discretionary balancing of many factors. Davis v. Witt, 02-3102 (La.07/02/03), 851 So.2d 1119; Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84; Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). The discretionary power to grant a new trial must be exercised with considerable caution, because a successful litigant is entitled to the benefits of a favorable jury verdict. The jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. Campbell v. Tork, Inc., 03-1341 (La.02/20/04), 870 So.2d 968.
In reviewing the trial court's denial of motions for JNOV and new trial, the appellate court is limited to a determination of whether the trial judge committed manifest error in its decision on the motions. Williams v. State ex rel. Dept. of Social Services, 37,923 (La.App. 2d Cir.01/28/04), *581 865 So.2d 908, writ denied, 04-0514 (La.04/08/04), 870 So.2d 276; Gibson, supra.
Miscellaneous Trial Issues
(1) Evidentiary Rulings
The trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of that discretion. Roberts v. Owens-Corning Fiberglas Corporation, 03-0248 (La.App. 1st Cir.04/02/04), 878 So.2d 631, writ denied, 04-1834 (La.12/17/04), 888 So.2d 863; Emery v. Owens-Corporation, 00-2144 (La.App. 1st Cir.11/09/01), 813 So.2d 441, writ denied, 02-0635 (La.05/10/02), 815 So.2d 842.
At trial, a party must make a timely objection to evidence that the party considers to be inadmissible and must state the specific ground for the objection. La. C.E. art. 103(A)(1); La. C.C.P. art. 1635; McWilliams v. Courtney, 41,725 (La.App. 2d Cir.12/13/06), 945 So.2d 242. On appeal, the court must consider whether the complained-of ruling was erroneous and whether the error affected a substantial right of the party affected. If not, a reversal is not warranted. La. C.E. art. 103(A); Emery, supra; Brown v. Associated Insurance Consultants, Inc., 94-1451 (La.App. 1st Cir.04/04/96), 672 So.2d 324, writ denied, 96-1106 (La.06/07/96), 674 So.2d 970. The determination is whether the error, when compared to the record in its totality, has a substantial effect on the outcome of the case, and it is the complainant's burden to so prove. Emery, supra.
Failure to contemporaneously object to an evidentiary ruling constitutes a waiver of the right to complain on appeal. Williams, supra; Bryant v. Newman, 39,437 (La.App. 2d Cir.04/20/05), 900 So.2d 343. In the absence of objection, the trial court is afforded no opportunity to prevent or correct the alleged error. Bordelon v. Drake, 578 So.2d 1174 (La.App. 5th Cir. 1991).
Olin asserts that the trial court erred in allowing plaintiffs to introduce into evidence: (a) a blown-up exhibit of Walter Graves' death certificate; (b) expert testimony about the disease process of asbestosis; (c) the testimony of Henry Muranko; (d) as to Brown Paper Mill, any evidence which concerned years other than those of Brown's ownership (1943-1952). Plaintiffs, however, contend that most of this evidence was admitted without any objection by Olin at trial and cannot now be assailed on appeal.
Defendant first argues that the trial court erred in admitting into evidence an enlarged copy of Walter Graves' death certificate with "cause of deathmesothelioma" highlighted in yellow. According to Olin, because they did not dispute the fact that Graves was deceased, the only purpose for introduction of the death certificate was to inflame, improperly influence, and prejudice the jury. At trial, Olin disputed Graves' diagnosis of mesothelioma and it is the corporation's position that plaintiffs improperly utilized the death certificate to "prove" that mesothelioma was Graves' cause of death.
Four expert witnesses, including Dr. Victor Roggli, a pathologist at Duke University Medical Center, Dr. John Maxwell, a Louisiana board certified pathologist, and two of Graves' treating physicians, Dr. William Smith and Dr. Trey Zizzi, testified unequivocally that Walter Graves had pleural mesothelioma caused by exposure to asbestos. Dr. Maxwell further testified that Graves' death from mesothelioma was caused by asbestos exposure.
As noted by this court in Gras v. Gras, 489 So.2d 1283 (La.App. 2d Cir. 1986), writ denied, 493 So.2d 1222 (La. 1986), where evidence is admitted that is *582 merely cumulative of other evidence in the record, any error in its admission is harmless. See also Hunt v. Long, 33,395 (La. App. 2d Cir.06/21/00), 763 So.2d 811; Kaufman v. Sewerage v. Water Board of New Orleans, 99-1942 (La.App. 4th Cir.05/03/00), 762 So.2d 644, writ denied, 00-1570 (La.08/31/00), 766 So.2d 1279.
Even if the trial judge erred in allowing plaintiffs to show the blown-up death certificate exhibit to the jury, in light of the cumulative expert testimony as to Walter Graves' disease process and cause of death as a result thereof, defendant has failed to show any prejudice and such an error is harmless. See Emery, supra.
Olin next contends that the trial court erred in allowing evidence concerning the historical development of knowledge of any asbestos-related disease, particularly asbestosis, other than mesothelioma. Defendant takes the position that this evidence was irrelevant and inadmissible.
We find no merit to defendant's argument. As found by the First Circuit in Roberts, supra, evidence of the development of scientific knowledge concerning all of the serious health risks posed by asbestos exposure is directly relevant to the issue of the foreseeability, from the stand-point of an employer such as Olin, of harm to workers such as Walter Graves. Not only is this evidence highly relevant, but its probative value is in no way outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury by considerations of undue delay or waste of time.[4]
According to defendant, the trial court erred in allowing into evidence the deposition of Dr. Henry Muranko, who went to work as Olin's industrial hygienist in 1971. Olin objected to this testimony at trial on the ground that Dr. Muranko did not begin working for Olin until after defendant had transferred its interest in the West Monroe paper mill. Defendant also objected to certain portions of Dr. Muranko's deposition, which were excluded from the testimony which was read to the jury. After Dr. Muranko's deposition, as edited, was read to the jury and entered into evidence, defense counsel commented, "no objection." Olin has no basis for complaint on appeal.
Nonetheless, we find no error in the trial court's ruling. Dr. Muranko's testimony was relevant on the issue of the presence (or lack thereof) of corporate safety policies concerning asbestos. From Dr. Muranko's statement that Olin had no asbestos safety policies in 1971 and was taking no steps to protect its workers from asbestos at that time, the jury could reasonably have made the inference that defendant had done nothing to protect or educate its workers at the paper mill prior to that time.
The final evidentiary complaint voiced by Olin is that the jury, in determining the liability of Brown Paper Mill, should not have been presented with any evidence which concerned years other than those of Brown's ownership of the mill, 1943-1952. This broad objection, however, was first raised on appeal, and is not timely.
*583 (2) Prejudicial Statements by Plaintiffs' Counsel
According to Olin, plaintiffs' counsel made several improper remarks during his opening statement, summation, and rebuttal argument, which resulted in an improper verdict. Specifically, defendant takes issue with the following remarks which came at the end of counsel's opening statement: "He [Walter Graves] died of malignant mesothelioma caused by asbestos exposure. At the close of the case on behalf of Walter, I will ask you to use your power as jurors in this case to hold Olin Corporation responsible for his death." There was no contemporaneous objection to these remarks, however, by defendant's attorney. Furthermore, in brief, the other objectionable remarks Olin takes issue with are not part of the appellate record, inasmuch as there is no transcription of the closing arguments.[5]
Nonetheless, the trial court adequately addressed defendant's concerns by instructing the jury that "The statements and arguments made by the attorneys are not evidence. In the opening statements, the attorneys were permitted to present, for your consideration, their contentions regarding what the evidence has shown or not shown, and what conclusions they think may be drawn from the evidence. You must distinguish between what counsel may have said and the evidence upon which those arguments are based. . . . The opening statements and the closing arguments are not to be considered as evidence." See Hunt, supra.
(3) Jury Instructions[6]
As a practical matter, a trial judge is under no obligation to give any specific instruction(s) that may be submitted by either party. Instead, the court must correctly charge the jury. Soileau v. State ex rel. Department of Transportation and Development, 97-1541 (La.App. 3d Cir.12/09/98), 724 So.2d 834. Adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Id.; Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La. App. 3d Cir.1991). A trial judge is not required to give an instruction unless the facts support the giving of the charge. Emery, supra; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 (La.App. 1st Cir.03/11/94), 634 So.2d 466, writ denied, 94-0906 (La.06/17/94), 638 So.2d 1094. The adequacy of jury instructions must be determined in light of the jury instructions as a whole. Soileau, supra.
Olin complains that "[T]he jury was not properly instructed with regards to the law to be applied in this case as requested in Olin's jury charges." Specifically, Olin asserts that "[T]he jury did not receive a *584 proper charge regarding the mandated foreseeability requirement within strict liability as set forth in Loescher v. Parr, 324 So.2d 441 (La.1976), and they did not receive an instruction (nor were they allowed to decide) the factual issue of whether asbestos was an oxygen or metal compound."
The requested jury instruction was as follows: "Before you can apply the doctrine of strict liability, you must first find that, at the time of the occurrence, the unreasonable risk of harm was `foreseeable.'" Rather than this instruction, the trial court's charge to the jury on the issue of strict liability was as follows:
In this case, plaintiffs further seek recovery against Olin Corporation for strict liability. Article 2317 [prior to its amendment in 1996] of the Civil Code provides as follows:
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.
In interpreting this standard, our courts have determined that when harm results from a defect in a thing which creates an unreasonable risk of harm to others, the person legally responsible for the custody of that thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the person's part is proved. This liability arises from his legal relationship to the thing which creates an unreasonable risk of harm to others. Should you find that Olin Corporation had care, custody or control of defective asbestos-containing products, then, under the law, liability does not depend on its knowledge of the risk of those products.
The plaintiff must prove in this case that:
(a) the thing in question was defective, i.e., that it posed an unreasonable risk of harm;
(b) that it was in the care, custody, or control of a defendant; and,
(c) that he was damaged as a result of this defect.
If plaintiff proves these three things by a preponderance of the evidence, the person in custody of the thing in question can escape liability only if he shows the harm was caused solely by the fault of the victim, by the fault of a third person, or by an irresistible force.
When I say that the thing in question had to be in the custody of the defendant, I mean either that he was the owner of it, or was in a position to exercise supervision or control over it, and to draw benefit from it. Although under most circumstances ownership alone establishes the requisite benefit, control, and authority to find custody, this presumption is rebuttable by the owner.
When I say that a defect in a thing creates an unreasonable risk of harm to others, I mean that the likelihood that harm might occur and the seriousness of such harm if it happen outweighs the importance to society of the custody of the thing and the way the owner or custodian has chosen to maintain the thing under the circumstances. This means that you are to weigh the magnitude of the possible harm against the utility of custody of the thing under all the prevailing circumstances.
In determining whether a thing presents an unreasonable risk of harm, you must assume that the owner had knowledge of the risk that the thing presented and then determine if a reasonable person with such knowledge would have maintained *585 the thing in that condition. Under this strict liability theory, it is not a defense that the owner did not know of the defect.
. . .
This instruction tracks precisely the legal principles set forth by the supreme court in Loescher, supra. As noted above, the trial judge is not required to give specific charges requested by either party, particularly when they contain misstatements of the applicable law. Instead, it is the duty of the trial court to correctly charge the jury, which includes providing correct principles of law. See Soileau, supra. This assignment of error lacks merit.
Causation/Accrual of Cause of Action
The gist of Olin's remaining two assignments of error is that the jury (and then the trial court) erred in finding that the evidence produced by plaintiffs at trial established that Walter Graves developed mesothelioma as a result of exposure to asbestos and/or asbestos-containing materials during his employment (a) at Brown Paper Mill from 1943-1955; and/or (b) with Olin from 1955 until acquisition of the paper mill by Johns-Manville in the 1970's.
Applicable Legal Principles
In 1952, by Acts 1952, No. 532, the Louisiana legislature amended the Workers' Compensation Act to bring within its ambit occupational diseases, which were defined as "[p]oisoning by or other disease resulting from contact with" specified substances listed, including "oxygen, nitrogen, carbon, and their compounds" and "metals other than lead and their compounds." La. R.S. 23:1031.1 (1952). The 1952 version of La. R.S. 23:1031.1 also included coverage for diseases caused by exposure to x-rays or radioactive substances, asbestosis, silicosis, dermatosis, and pneumonoconiosis. Thereafter, La. R.S. 23:1031.1 was amended in 1958 to add tuberculosis (when contracted under certain enumerated circumstances) as one of the specified occupational diseases.
In 1975, by Acts 1975, No. 583, § 2, the legislature revised La. R.S. 23:1031.1 by removing the list of specific diseases for which there was coverage under workers' compensation and substituting a more comprehensive definition:
An occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.[7]
The above provisions plainly show that, before 1952, there was no workers' compensation coverage for any occupational disease. Where the Louisiana Workers' Compensation Act provides no coverage, such as for a worker who contracts an occupational disease before 1952, the employee is free to proceed against his employer in tort. Austin v. Abney Mills, Inc., 01-1598 (La.09/04/02), 824 So.2d 1137. Also clear is that, after the amendment of La. R.S. 23:1031.1 in 1975, mesothelioma is included as an occupational disease covered by Louisiana's workers' compensation scheme. The issue that has yet to be definitively decided by the Louisiana Supreme Court is whether mesothelioma fits within the 1952 statute's definition of occupational disease such that an employer of a worker who contracted this asbestos-related disease after 1952 but before 1975 would be entitled to tort immunity and *586 liable only for workers' compensation benefits to the injured employee. See Powell v. Weaver, 01-2937 (La.02/07/03), 841 So.2d 742.
In Callaway v. Anco Insulation, Inc., 98-0397 (La.App. 4th Cir.03/25/98), 714 So.2d 730, writ denied, 98-1034 (La.11/19/99), 749 So.2d 666, the Fourth Circuit held that, because the pre-1975 version of La. R.S. 23:1031.1 did not specifically include mesothelioma as a covered disease or asbestos as a substance that caused disease, the plaintiffs were not precluded from pursuing a negligence action against their employer. See also Gautreaux v. Rheem Manufacturing Co., 96-2193 (La.App. 4th Cir.12/27/96), 694 So.2d 977, in which the appellate court affirmed the trial judge's denial of an exception of no cause of action based on workers' compensation exclusivity filed by an employer, finding that asbestos was not a substance listed in the pre-1975 version of La. R.S. 23:1031.1 that, when it caused disease, would be covered by the exclusive remedy provision of the workers' compensation statute.
However, in Brunet v. Avondale Industries, Inc., 99-1354 (La.App. 5th Cir.12/05/00), 772 So.2d 974, the Fifth Circuit held that, under the pre-1975 version of La. R.S. 23:1031.1, a claimant's occupational disease did not have to be specifically listed by name in order for it to be covered. Instead, when presented with a claimant with a non-listed disease, the court must then determine whether the substance involved was included in the subcategories. This approach was followed by this court in Adams v. Asbestos Corporation, Ltd., 39,952 (La.App. 2d Cir.10/28/05), 914 So.2d 1177. In Adams, this court held that under the 1952 version of La. R.S. 23:1031.1, any disease resulting from contact with asbestos was an occupational disease covered by workers' compensation.
To establish when a tort cause of action accrues in a long-latency occupational disease case wherein the plaintiff suffers from the disease, the plaintiff must present evidence that the exposures were significant and that such exposures later resulted in the manifestation of damages. Austin, supra; Adams v. Owens-Corning Fiberglas Corporation, 04-1296 (La.App. 1st Cir.09/23/05), 921 So.2d 972, writ denied, 05-2501 (La.04/17/06), 926 So.2d 514.
"Significant exposures" occur and the cause of action accrues when asbestos dust has so damaged the body that the fibrogenic effects of its inhalation will progress independently of further exposure. Austin, supra; Abadie, supra.
Once a party's cause of action accrues it becomes a vested property right that may not constitutionally be divested. Cole v. Celotex Corporation, 599 So.2d 1058 (La.1992). Statutes enacted after the acquisition of such a vested property right cannot be retroactively applied so as to divest the plaintiff of his vested right in his cause of action. Austin, supra; Cole, supra.
This general rule applies in the context of workers' compensation and occupational disease. Austin, supra. If an employee acquires the right to sue in tort for a non-covered occupational disease, he cannot later be divested of the right by subsequent legislative expansion of coverage for occupational disease. Id. As noted by the Fifth Circuit in Bourgeois v. A.P. Green Industries, 02-0713 (La.App. 5th Cir.02/25/03), 841 So.2d 902, the law in effect at the time of the tortious exposures applies if the evidence proves that the exposures were significant and resulted in the later manifestation of disease, causing damages to the plaintiff. See also Adams *587 v. Owens-Corning Fiberglas Corporation, supra.
Analysis
According to plaintiffs, the evidence they presented at trial was sufficient for the jury to find that Walter Graves contracted mesothelioma prior to 1952 such that his tort cause of action against Brown Paper Mill (and Olin as Brown's successor-in-interest), once accrued, was unaffected by the enactment of and subsequent amendments to La. R.S. 23:1031.1. On the other hand, defendant contends that plaintiffs' evidence was inadequate to establish the requisite "significant exposure" prior to 1952. Defendant urges that inasmuch as Graves' development of mesothelioma was after 1952, Olin is entitled to tort immunity, with Graves' exclusive remedy lying in workers' compensation.
Walter Graves began working at the Brown Paper Mill in 1943. By the time that the legislature first provided for the coverage of occupational diseases under Louisiana workers' compensation law in 1952, Graves had worked in the paper mill for nine years. The following evidence on the issue of Graves' pre-1952 exposures was presented to the jury.
Several of Graves' coworkers testified, via deposition or at trial. One coworker, Jack Gates, testified that he began his employment with Brown Paper Mill in 1947. After working as a laborer and water tender for the first several years, he worked as a maintenance helper for 14 years before becoming a maintenance mechanic in 1966, the job he held until his retirement in 1987.
Gates testified that each year, the plant shut down for maintenance for two weeks at a time, once in July and once at Christmas. There were two 12-hour shifts which ran seven days a week. Beginning in 1947, he worked every shutdown, as did Walter Graves. According to Gates, the only times that Graves, who was a millwright or pipefitter, would work in the powerhouse were during shutdowns. Because no one could work until the powerhouse went back "online," they had to pull workers from other departments during shutdowns. Most people were eager to work shutdowns because they got overtime pay.
Walter Graves' primary responsibility during the shutdowns was to work on the turbines. This entailed removing the covers from the large engines and "beating" the asbestos insulation off of the turbines. It took 8-12 hours to get the cover off one turbine and that is when there were no problems. The insulation sheets were bolted down every couple of inches and the tear down process was tedious and time-consuming. Gates was adamant that he and Graves were both exposed to asbestos and asbestos dust during the insulation removal process each shutdown. Likewise, they were exposed to asbestos and asbestos dust while the insulators were putting the new insulation on the turbines during the shutdowns. There was no way they could keep from breathing asbestos dust during the insulation process. According to Gates, the dust was so thick they couldn't even see each other. Aside from a few open windows, there was no ventilation. Gates testified that they were never warned of the hazards of exposure to asbestos. He only learned of the dangers of asbestos about 5-6 years before he left the paper mill (which was in 1987) when OSHA came out to the mill to conduct some dust surveys.
James Moore testified that he worked with Walter Graves from 1946 to 1950 in the "bull gang," or maintenance department, which included millwrights, pipefitters, welders, boilermakers, insulators, and painters. One of the first assignments he *588 could remember was a week he and Graves spent cleaning up old insulation in the mill's recovery room. Moore explained that there were hundreds of miles of pipes at the paper mill because a paper plant runs on steam, which is created by pressure from the numerous boilers. All of the equipment which handled anything related to heat or steam had to be insulated, and the only type of insulation they had to use back then was asbestos. Moore and Graves, as part of the "bull gang," cleaned up everything that had to be picked up, which included bits and pieces of old insulation. During this process, which was frequent, they breathed in asbestos dust.
Moore testified that his employer did not warn about the hazards of asbestos or otherwise suggest procedures for worker protection, such as requiring that the old asbestos be wet down prior to its being swept up and disposed of.
Dr. Victor Roggli, a pathologist with a concentration in diseases related to asbestos exposure, when presented with the facts of a worker such as Walter Graves, who had, for several weeks at a time, twice annually, for a period of several years successively, breathed asbestos dust which was so thick in the air that he and his coworkers could actually see the dust, opined that such exposures would have been be a substantial contributing factor to the development of Graves' mesothelioma. Dr. Richard Lemen, an expert in epidemiology and industrial hygiene, testified, based upon a review of depositions of Graves' coworkers and corporate representatives, that he found no evidence whatsoever that Brown Paper Mill had done anything to prevent its workers from being exposed or to educate the workers about the potential hazards they were facing. He also saw no evidence of any sampling or evaluations as to whether exposure was actually occurring. It was Dr. Lemen's opinion that Brown Paper Mill did not provide Walter Graves with a reasonably safe place to work prior to 1952. Dr. Lemen testified that, where nothing was done to control workers' exposure to asbestos, there existed a hazardous condition that posed an unreasonable risk of harm in the premises in the care, custody, and control of Brown Paper Mill (to workers such as Walter Graves) during the years between 1943 and 1952.
"Exposure" has been defined in asbestos cases as inhalation of asbestos fibers into the lungs. Owens, supra; Asbestos, supra; Abadie, supra. The above testimony is more than sufficient evidence that Walter Graves had significant exposures to asbestos while working at the paper mill prior to 1952. Therefore, his tort cause of action against his employer vested prior to the enactment of La. R.S. 23:1031.1, and was not divested by its creation or any of the subsequent amendments.[8]
Sufficiency of Proof of Third Party Fault Produced by Olin
Olin argues that neither it nor Brown Paper Mill manufactured the asbestos containing products used at the paper mill. Olin complains that the jury's failure to hold the manufacturers liable was clear error. Olin argues that these products were dangerous per se and established strict liability upon the manufacturers.
Louisiana Civil Code article 2323 requires that the fault of every person responsible for a plaintiff's injury be compared, whether or not such person is a party, and regardless of the theory of liability *589 asserted against that person. Foley v. Entergy Louisiana, Inc., 06-0983 (La.11/29/06), 946 So.2d 144; Keith v. United States Fidelity & Guaranty Company, 96-2075 (La.05/09/97), 694 So.2d 180.[9] Olin, as the party asserting joint fault, bears the burden of proof by a preponderance of the evidence that the other person's fault was a cause in fact of the damages complained of. Watson v. Brazeel, 36,499 (La.App. 2d Cir.12/18/02), 833 So.2d 1276, writ denied, 03-0217 (La.04/04/03), 840 So.2d 1215.
When evaluating liability in an asbestos case, traditional theories of tort liability apply, which require proof of causation. Emery, supra; Quick v. Murphy Oil Company, 93-2267 (La.App. 4th Cir.09/20/94), 643 So.2d 1291, writ denied, 94-2583 (La.01/06/95), 648 So.2d 923. Asbestos cases typically involved multiple defendants. Emery, supra. Any exposure or inhalation of a respirable asbestos fiber may cause lung disease. Roberts, supra. To establish liability on the part of a manufacturer or distributor, it is insufficient to simply show that the product contained asbestos; rather the burden is to show that the product released asbestos dust or fibers that were inhaled by plaintiff and that this exposure was a substantial factor in bringing about the injury. Id.; Asbestos v. Bordelon, 96-0525 (La.App. 4th Cir.10/21/98), 726 So.2d 926. Evidence of the mere physical presence of an asbestos-containing material or product or material is insufficient to find a manufacturer liable to a plaintiff. Roberts, supra; Abadie v. Metropolitan Life Insurance Company, 00-344 (La.App. 5th Cir.03/28/01), 784 So.2d 46; writs denied, 01-1533, 01-1534, 01-1543, 01-1544 (La.12/14/01), 804 So.2d 642, 643.
Our review of the record fails to show manifest error on the part of the jury in finding no fault on the part of the other alleged joint tort feasors. Olin simply failed to establish the requisite causal prerequisites necessary for a finding of liability on the part of any of the other alleged joint responsible parties.

Conclusion
Finding that reasonable minds could differ, the standard for denying JNOV, Cook, supra, and that the jury's verdict is supportable by a fair interpretation of the evidence, as is required for denial of a new trial motion, Campbell, supra, we find no manifest error in the trial court's denial of Olin's motions for JNOV and new trial. Costs are assessed to defendant-appellant, Olin Corporation. AFFIRMED.

APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, DREW and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] Other defendants included businesses engaged in the mining, manufacturing, sales, distribution and/or supply of asbestos products, and insurers of these providers of asbestos products.
[2] The original petition was also amended to remove all references to Riverwood International Corporation and Riverwood and to replace those references with Olin Corporation and Olin respectively.
[3] Olin contends that the trial court erred in denying its motion for directed verdict on the issues of whether plaintiffs established liability on the part of Brown Paper Mill and whether plaintiffs established garde on the part of General Electric and Westinghouse. Olin, however, did not rest on its motion for directed verdict, but exercised its right to present evidence after the trial court denied its motion. A defendant who introduces evidence after the denial of its motion for directed verdict is deemed to have abandoned the motion and the evidence in the case is judged on the entirety of the record. Holloway v. Midland Risk Insurance Company, 36,262 (La. App. 2d Cir.10/30/02), 832 So.2d 1004, writ denied, 02-3247 (La.03/28/03), 840 So.2d 571; Jackson v. Quick, 543 So.2d 552 (La.App. 4th Cir.1989), writ denied, 546 So.2d 1219 (La. 1989); Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir. 1983), writs denied, 433 So.2d 1056, 1057 (La.1983).
[4] Louisiana Code of Evidence art. 401 defines "relevant evidence" as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. If the evidence meets this "probative worth" requirement, La. C.C. art. 403 provides that it should be admitted unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time.
[5] According to defendant, during summation and rebuttal, plaintiffs' counsel repeatedly stated that Olin "broke the laws of Louisiana." Defendant also complains that plaintiffs' counsel stated several times that Olin "dumped" the paper mill into a shell corporation and "left the state." Failure to object constitutes a waiver of the right to complain about the remarks on appeal. See Sims v. Ward, 05-0278 (La.App. 1st Cir.06/09/06), 938 So.2d 702, writ denied, 06-2104 (La.11/17/06), 942 So.2d 535; Cooper v. United Southern Assurance Company, 97-0250 (La.App. 1st Cir.09/09/98), 718 So.2d 1029.
[6] Olin, in brief, also argues that the jury selection process was tainted, resulting in a "spoiled jury," primarily as a result of the trial court's decision to allow plaintiffs' counsel to ask potential jurors whether they "could award millions of dollars for mental anguish." Although plaintiffs rebutted this argument at length in their brief, because this issue was not assigned as error it will not be addressed by this court on appeal. See Reaux v. City of New Orleans, 01-1585 (La.App. 4th Cir.03/20/02), 815 So.2d 191, writ denied, 02-1068 (La.06/14/02), 817 So.2d 1158.
[7] Subsequent amendments to La. R.S. 23:1031.1 are not relevant to this case and will not therefore be discussed.
[8] Our ruling today in no way conflicts with our decision in Adams, supra, inasmuch as the plaintiff's exposures in that case all occurred after the enactment of La. R.S. 23:1031.1.
[9] Although both parties have argued that pre-comparative fault principles apply, Keith, supra, at 183, held that the Louisiana Supreme Court held:

[T]he legislative amendment [by Act 3 of 1996] of La. Civ.Code art. 2323 was procedural legislation. Act. 431 of 1979 was amended and reenacted La. Civ.Code arts. 2103, 2323, and 2324 to usher a comparative fault system into Louisiana. This act eliminated the doctrine of contributory negligence and provided the framework for a comprehensive scheme of loss apportionment in a multi-party litigation. . . . [T]he legislative changes reflected in Act. 3 are procedural, and can be applied retroactively.
See also Landry v. Avondale Industries, Inc., 03-3432 (La.07/02/04), 877 So.2d 970.