DREW, J.
|, Unum Life Insurance Company appeals a judgment ordering it to pay continued disability benefits, attorney fees, and a penalty to Gary Scott.
We amend the judgment to reduce the penalty and attorney fees awarded, and as amended, we affirm the judgment.
FACTS
Gary Scott, who was born in 1954, was employed as a master plumber and pipefit-ter at the University of Louisiana at Monroe (“ULM”), where he worked for 16 years. Scott began paying for disability insurance while working at ULM.
The disability insurance was originally offered through another insurer before Unum took over the program. The policy read:
“Disability” and “disabled” mean that because of injury or sickness:
1. the insured cannot perform each of the material duties of his regular occupation; and
2. after benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is rea- ' sonably fitted by training, education or experience.
The policy also stated that the benefit would be paid for the period of disability if the insured gave to Unum proof of continued disability and “regular attendance of a physician.” Proof of these facts must be given, at the policyholder’s expense, when Unum asked for it.
Scott recalled twice injuring his back at work. The first time occurred in 2000 when he picked up a concrete lid for a fountain. The second time occurred in 2004 when he picked up an ice machine. Dr. David Hebert began treating Scott in 2003 for severe lower back pain and other physical | ¡¡ailments. As early as December of 2004, Dr. Hebert suspected that Scott was clinically depressed.
Scott stopped working on September 1, 2006. After treating Scott on October 30, 2006, Dr. Hebert thought he was basically disabled, mostly because of his depression, although he also felt degenerative joint disease of the lumbar spine and chronic *743 low back pain contributed to Scott’s inability to work his job at ULM.
Scott applied for disability benefits in early December of 2006. On December 18, 2006, Michael Marley, the Unum disability benefits specialist assigned to Scott’s claim, sent a claim initiation letter to Scott. Marley wrote that in order to determine if Scott met the policy definition of disability, Unum would need additional information about his restrictions and limitations and the requirements of his occupation.
Marley called Scott on December 26, 2006, to get additional information to evaluate his claim. Scott told Marley that he was not working because of back problems and depression, and that he was being treated by Dr. Hebert. Scott also discussed his medications. Marley said he went over the definition of disability with Scott at that time.
On January 5, 2007, Dr. Hebert completed an “Attending Physician’s Statement for Disability Benefits.” The diagnoses made by Dr. Hebert were degenerative joint disease of the lumbar spine and major depressive disorder without psychosis. Dr. Hebert gave September 2006 to February 2007 as the approximate duration of disability.
Is Amy Herrick, a clinical consultant for Unum, called Dr. Hebert on January 11, 2007. Dr. Hebert told Herrick that he felt duped by Scott because he thought that Scott would return to work; instead, Scott wanted to remain on disability indefinitely and had no intention of returning to work. Dr. Hebert also told Herrick that Scott needed to get an MRI and to see an orthopedic specialist and a psychologist, which Scott was refusing to do. Dr. Hebert added that he had thought Scott would need only one to two months of disability when he signed the disability papers for Scott. According to Dr. Hebert, Scott’s depression was a far greater issue than his back condition, and he felt that Scott needed to seek further treatment instead of just taking medications.
Dr. Peter Kouros, a medical consultant for Unum, reviewed Scott’s file and felt that additional information was needed to accurately assess any possible impairment. Dr. Kouros recommended a psychiatric independent medical examination (“IME”) and a functional capacity evaluation (“FCE”) to better delineate Scott’s present functional capacity.
On January 20, 2007, Scott received a letter from Marley stating that Unum had approved his request for benefits. The letter reproduced the policy’s definition of disability. Scott was told that in order to qualify for ongoing benefits, he must continue to meet the definition of disability, and that Unum would periodically request medical evidence and vocational information to support the continuation of benefits. Marley also wrote that because the extent of Scott’s disability was unclear, Unum wanted him to undergo a FCE and a psychiatric IME in order to fully evaluate his claim. pMarley added that because Scott had not sought treatment from an orthopedist or a psychiatrist as recommended by Dr. Hebert, his claim was being approved under a reservation of rights.[1] Finally, Marley wrote that in order for Scott to be eligible for benefits beyond December 1, 2008, he needed to be disabled from any gainful occupation as a result of his physical condition.
*744 Unum began paying benefits of $978.29 per month under the policy effective December 2, 2006.[2] The first check covered the period of disability from December 2, 2006, through January 1, 2007.
Scott’s FCE was performed by Jay Manning on February 13, 2007. Manning concluded that Scott was able to work at the light physical demand level.
Dr. George Seiden performed the psychiatric IME of Scott on behalf of Unum. Dr. Seiden’s impression was that Scott had an adjustment disorder with depressed mood. Dr. Seiden believed that Scott was having a complicated grief reaction to his father’s death. Dr. Seiden felt that Scott’s depression was readily treatable and that he was never completely disabled by his depressive disorder. He did not think that Scott had received appropriate care for his psychiatric condition, although he recognized that treatment would be difficult because of Scott’s lack of motivation to improve.
| ¿On March 20, 2007, Dr. Kouros examined Scott’s medical records and concluded that Scott’s occupational demands were in excess of his reasonable functional capacity as demonstrated by the FCE. Dr. Kouros noted that Scott’s evaluation was limited because of Scott’s refusal to complete studies or referrals.
On October 23, 2007, Marley wrote to Scott that based upon the results of the FCE, Scott was disabled from his regular occupation as a plumber/pipefitter because of his back condition. Marley also wrote that the psychiatric IME did not support psychiatric impairment that prevented Scott from performing his occupation, and thus, it did not appear that he was disabled due to depression.
In March of 2008, Marley wrote to Scott to inform him that Unum was beginning to review his eligibility for benefits beyond the initial 24-month period. In November of 2008, Robin Giese performed a vocational assessment in which he identified security guard and gate guard as vocational options for Scott. Giese thought those positions were consistent with Scott’s prior work history, skills, education/training, demonstrated general educational development levels, and restrictions and limitations.
On November 19, 2008, Marley wrote to Scott to inform him that Unum was denying his request for benefits, and that benefits would not be paid past December 1, 2008. Marley noted that Giese had concluded that although Scott’s occupation of plumber/pipefitter required physical demands in excess of his reasonable restriction and limitations, he was able | fito work in alternate occupations, including security guard at $9.95 an hour and gate guard at $9.21 an hour. Therefore, he was not disabled from any gainful occupation due to his physical condition.
Marley informed Scott that he was required to submit any additional information in support of his request for benefits within 180 days, and that Unum would reconsider his claim. Scott was told that he could appeal this decision, and the review would take into account all new information even if it was not available at the initial determination. Scott was also told that he could bring an ERISA claim if he disagreed with the determination on appeal.
Scott appealed Unum’s decision in February of 2009. He argued to Unum that he should be continued on disability on the grounds that he continued to have lower back pain on a daily basis for which he *745 received medical treatment, and because his overall mental health had declined as a result of his lower back pain. In support of his appeal, Scott submitted a December 10, 2008, office note from his treating physician, Dr. Ronald Hubbard.
Karen Connolly, the Unum appeals specialist assigned to Scott’s claim, realized after reviewing Scott’s file that she needed it reviewed by Unum’s medical department. Two physicians, Dr. Robert Hill and Dr. Jana Zimmerman, who were Unum medical consultants, then reviewed his file. Dr. Hill examined Scott’s records to determine if his back condition was disabling; Dr. Zimmerman was to determine if his depression was disabling.
|7On April 3, 2009, Connolly wrote to Scott that Unum had determined that the decision to close his claim was appropriate. Connolly made reference to the section of the policy on “regular attendance of a physician.” She noted that Scott did not pursue specialized treatment of his depressive condition despite referrals, and he did not heed Dr. Hebert’s recommendations of an MRI and evaluation by an orthopedic specialist. Connolly wrote that Scott’s records did not show impairment from a psychiatric condition necessitating restrictions or limitations. She also wrote that he had the physical capacity to perform the alternative occupations of security guard and gate guard, so he was no longer disabled as defined in the policy.
Scott sued Unum on April 29, 2009.[3] He contended that the termination of benefits and refusal to resume payment was arbitrary, capricious, and without probable cause and entitled him to a penalty and attorney fees in addition to the benefits due.
Following a trial on the merits, the court ruled in favor of Scott. The court found that the language in the policy was more narrowly defined and restrictive than allowed by Louisiana law, namely La. R.S. 22:990(C). The court noted that while Unum believed that Scott could perform the material duties of gate guard and security guard, once the court compared Scott’s base monthly pay rate with the monthly pay rates for a security guard and a gate guard, it was clear that the termination of benefits violated La. R.S. |S22:990(C) because those occupations did not provide Scott with substantially the same earning capacity as required by law. In addition, the court concluded that even if those positions provided substantially the same earning capacity, there was no evidence that Scott was qualified for those positions by reason of education, training, or experience.
The court noted that Marley, who had a Juris Doctor degree from the University of Maine, was under a duty to familiarize himself with Louisiana law. The court concluded that Marley should have known that the salary information provided by Giese did not equate to substantially the same earning capacity required under Louisiana law in order to terminate benefits. The court ruled that Unum violated La. R.S. 22:1821 by discontinuing benefits without just and reasonable grounds.
Unum was ordered to reinstate benefits retroactive to December 1, 2008, and to continue to pay $978.29 per month in accordance with the law and its policy provisions. Accrued benefits at the time of judgment were $23,478.96. Unum was assessed a penalty of $46,957.92 and attorney fees of $23,455.00 for violating La. R.S. 22:1821. The attorney fees were based on *746 a one-third contingency fee of the $70,436.88 judgment.
DISCUSSION
Unum contends on appeal that: (1) the trial court failed to address the threshold requirement that Scott did not receive regular care for his alleged disability; (2) the trial court admitted irrelevant evidence; (3) the trial court erred in ruling that the policy’s definition of disability was more restrictive than allowed in Louisiana; (4) the trial court was clearly wrong in finding |9that a penalty and attorney fees were warranted; and (5) the trial court erred in its calculation of the penalty and attorney fees.

Regular attendance of a physician

Unum contends that the trial court failed to address the threshold requirement of whether Scott was receiving regular care for his alleged disability. Unum argues that the failure to follow Dr. Hebert’s recommendations to see an orthopedist and behavioral therapist was a violation of the “regular attendance of a physician” provision of the policy.
Dr. David Hebert, an internal medicine physician, first treated Scott for complaints of lower back pain in October of 2003. He prescribed narcotic analgesics and muscle relaxers to help Scott’s lower back symptoms. Toward the end of 2004, Dr. Hebert thought that Scott was depressed and had probable degenerative disc disease of the lumbar spine. Dr. Hebert noted in his records on November 16, 2006, that he felt strongly that Scott should see an orthopedic doctor for an evaluation of his lower back pain. He made this recommendation many times to Scott to no avail.
Although Dr. Hebert thought that Scott was truly disabled in January of 2007, he did not think that Scott was going to be disabled for the remainder of his life. Dr. Hebert explained that when he spoke with Amy Herrick, he was frustrated that Scott was not seeing an orthopedist or psychiatrist, and had not gotten an MRI of his back.
Dr. Hebert terminated Scott as a patient in May of 2007 because he felt that he was not helping Scott by continuing with the same treatment. |inDr. Hebert thought that his evaluation of Scott’s back was limited because Scott would not undergo additional testing. Even Dr. Hebert’s diagnosis of degenerative disc disease was a guess, but he thought it was the most likely lower back condition that was causing symptoms. Dr. Hebert added that it is difficult to be a doctor when a patient refuses tests and treatments. He also thought that Scott was not motivated to return to work.
On May 2, 2007, Scott began seeing an orthopedist, Dr. Douglas Brown, albeit for a foot injury. When Dr. Brown saw Scott again for his foot later that month, Dr. Brown noted that Dr. Hebert was treating Scott with chronic pain medication for his back problems. Brown would go on to suggest surgery for Scott’s foot, but Scott was not interested in having surgery.
When Dr. Brown treated Scott for his foot on June 4, 2007, he noted that Scott’s back condition had been under treatment by Dr. Hebert for several years. He added that all medications regarding his back must come from Dr. Hebert.[4] Dr. Hebert explained that Dr. Brown took this step to prevent Scott from getting twice the pain medications that he needed. Dr. Hebert also explained that this note meant that Dr. Brown was not addressing the back *747 problem. Later that summer, Dr. Brown referred Scott to pain management and a psychological evaluation, neither of which he pursued.
Dr. Ronald Hubbard, an internal medicine physician, began treating Scott for his foot injury on July 9, 2007. Scott gave a history of back pain Into Dr. Hubbard. Beginning in February of 2008 and going through May of 2010, Dr. Hubbard regularly treated Scott for his back pain.
Dr. Brown examined Scott on October 11, 2010, at the request of Scott’s attorney. Scott complained of worsening of his longstanding back problems. Dr. Brown’s impression was L4-5, L5-S1 disc disease with SI neuropathy. Dr. Brown wanted Scott to see Dr. Hubbard for any pain medicine, and he thought an MRI of Scott’s lumbar spine was needed before he could ascertain Scott’s true disability.
Dr. Brown treated Scott again on October 28, 2010. He noted that Scott’s medications were controlled by Dr. Hubbard. He also noted that an MRI of the lumbar spine taken eight days earlier showed degenerative bulging discs at L4-5, L5-S1. Dr. Brown’s impression was that Scott had symptomatic lumbar degenerative disc disease at L4-5, L5-S1. Dr. Brown wrote that Scott was to see Dr. Hubbard and apply for social security. Dr. Brown did not think that any further orthopedic treatment was necessary.
Dr. Hebert testified that an orthopedist would not be limited to treating Scott’s pain with narcotics and muscle relaxers, but would also utilize injections, pain management, and physical therapy. Dr. Hebert thought that Scott was fearful that an orthopedist would want to do surgery.[5] Scott also declined to see a pain management doctor.
When asked about Dr. Brown’s statement in October of 2010 that no further orthopedic treatment was necessary, Dr. Hebert said that he agreed |12that the treatment Scott was receiving was the treatment that he should have been receiving all along. Dr. Hebert also agreed that Dr. Brown sent Scott back to Dr. Hubbard to continue that regimen. However, Dr. Hebert explained that what he meant by having Scott see an orthopedist was not to have the orthopedist send Scott back to his treating physician, but that he was thinking more along the lines of the orthopedist evaluating Scott’s back, ordering an MRI, and then providing a treatment like steroid injections. Dr. Hebert had hoped that Scott would receive orthopedic treatment that would restore his ability to work as a plumber. Nevertheless, Dr. Hebert acknowledged that Dr. Brown did not recommend steroid injections, physical therapy or other orthopedic treatment.
The disability policy does not define what is meant by “regular attendance of a physician.” Unum points us to a meaning given by a federal district court judge in an unpublished opinion in Lefebvre v. Ivex Packaging Corp., 1998 WL 325258 (N.D.Ill.1998):
This court agrees that the “regular attendance of a physician” requirement does not mandate that plaintiff must visit his physician on a monthly basis. Instead, when defined according to its plain, ordinary and popular meaning, the term “attend” means “to take care or charge of’ or “to serve as doctor to during an illness.” The term “regular” means “usual or customary.” Thus, the regular attendance requirement means *748 that the insured must be under the customary care of his doctor.
(Citations omitted.)
At the time that benefits were terminated, Scott was under the regular attendance of a physician, Dr. Hubbard. Although not every visit was about his back, Dr. Hubbard saw Scott at least once a month between December 3, 2007, and the date of termination. Prescriptions for his pain medications |13and muscle relaxers were refilled during these visits. While Scott was not being treated by an orthopedist as Dr. Hebert would have liked, this treatment by Dr. Hubbard was nonetheless the regular attendance of a physician as required by the policy.
The asserted failure to be under the regular attendance of a physician was not mentioned in the letter from Marley informing Scott that his benefits had been terminated. Moreover, Scott was never told by anyone from Unum that he needed to undergo an orthopedic examination in order to continue receiving benefits. Unum had the right to ask Scott to submit to an orthopedic exam, but it never did. Connolly explained that Unum did not compel Scott to undergo an orthopedic examination because it already had the results from the FCE.
Unum argues that Scott failed to fulfill his duty to mitigate damages when he delayed seeking an evaluation by an orthopedist as recommended by Dr. Hebert. However, this evaluation would have been of minimal value in the treatment of Scott for his disabling back condition. Dr. Brown left the medication treatment of Scott’s back condition up to his internal medicine doctors, and after Dr. Brown examined the results of the MRI, he decided that no further orthopedic treatment was necessary.
Since Scott was under the regular attendance of a physician, there was no error in the trial court not directly addressing whether Scott met this policy requirement.
114Pr. Hebert testified that Scott’s depression was just as much a reason as the back pain for why he said Scott was disabled as of September 2006. Dr. Seiden later concluded that Scott’s depression was not disabling.
Dr. Hebert did not feel comfortable in treating a patient with chronic depression, so he recommended that Scott see a psychiatrist.[6] However, because it would have taken several weeks for Scott to see a psychiatrist if he had even agreed to see one, Dr. Hebert began treating Scott for his depression. Dr. Hebert believed that because of his treatment for several months, Scott’s depression had improved by the time that Dr. Seiden examined him. Dr. Hebert disagreed with Dr. Seiden’s position that Scott was never completely disabled because of his depression.
In any event, it is unnecessary for this court to dwell on Scott’s failure to seek treatment by a psychiatrist as the trial court found that Scott was entitled to continued benefits on the basis of his disabling back condition.

Evidentiary ruling

Unum also complains that the trial court allowed into evidence, over Unum’s objections, Scott’s records for medical treatment after the termination of benefits. Unum complains that these records were irrelevant to the 2008 termination of benefits. Unum also complains that among these records was an office note from Dr. Brown that it received four days before trial. The note was created by Dr. Brown less than two weeks before trial.
*749 A trial court is granted broad discretion in its evidentiary rulings, which will not be disturbed on appeal absent a clear abuse of that discretion. Hays v. Christus Schumpert Northern Louisiana, 46,-408 (La.App.2d Cir.9/21/11), 72 So.3d 955; Graves v. Riverwood Intern. Corp., 41,810 (La.App.2d Cir.1/31/07), 949 So.2d 576, writ denied, 07-0630 (La.5/4/07), 956 So.2d 621.
These records documented Scott’s continued regular attendance with Dr. Hubbard. In addition, the 2010 medical records from Dr. Brown showed that for all of Dr. Hebert’s protests that Scott needed to be treated by an orthopedist, Dr. Brown concluded that Scott had degenerative disc disease and referred Scott back to Dr. Hubbard because no further orthopedic treatment was necessary. We find no abuse of discretion by the trial court in allowing these records to be admitted into evidence.

Conñict between state law and the policy provisions

Unum argues that the trial court erred in ruling that the definition of disability found in the policy was more restrictive than allowed by La. R.S. 22:990, which provides, with our emphasis added:
A. An individual or group disability loss of income policy to provide loss of income protection against total disability may be issued in this state consistent with the definitions and provisions of this Section.
B. Total disability may be defined in relation to the inability of the person to perform duties but shall not be based solely upon an individual’s inability to either:
(1) Perform “any occupation whatsoever”, “any occupational duty”, or “any and every duty of his occupation”.
(2) Engage in any training or rehabilitation program.
C. A general definition of total disability in such a policy shall not be more restrictive than one requiring the individual to be totally disabled from engaging in any employment or occupation for which he is, or becomes, qualified by reason of education, training, or experience and |, ¿which provides him with substantially the same earning capacity as his former earning capacity prior to the start of the disability.
D. An insurer may specify the requirement of the complete inability of the individual to perform all of the substantial and material duties of his regular occupation or words of similar import.
E. An insurer may require care by a physician other than the insured or a member of the insured’s family.
Once disability benefits were paid for 24 months, the Unum policy defined “disability” and “disabled” as meaning that because of injury or sickness, Scott could not perform each of the material duties of any gainful occupation for which he was reasonably fitted by training, education or experience.
This provision does not speak of any earning capacity requirements for the gainful occupation. In doing so, it increases the number of potential occupations available to the insured, making the designation of disability more difficult to attain under the policy. Therefore, the policy presents a definition of disability that is more restrictive than permitted under La. R.S. 22:990(C). The trial court did not err in finding that the policy was more restrictive than allowed by law.
Jerry Manning, who testified on behalf of Unum as an expert physical therapist, administered Scott’s FCE. Man *750 ning thought Scott could work at a light-work level for an eight-hour day. Scott would have to change between sitting and standing positions as needed for pain. Scott would be unable to tolerate functional positions such as prolonged squatting, kneeling, or bending positions needed for plumbing work. Manning’s conclusion was |17that Scott could not return to his plumbing job but that he could perform light duties within his restrictions.
There is no dispute that the work restrictions placed upon Scott are reasonable and preclude him from working in his former position. Dr. Hebert thought the restrictions were permanent and that Scott would have to be retrained for another line of work. Two occupations, security guard and gate guard, were identified by Giese as alternative occupations for Scott.
At the time he stopped working, Scott earned $14.40 per hour or $2,445.73 per month. A security guard position would pay $9.95 per hour or $1,724.67 monthly. A gate guard position would pay $9.21 per hour or $1,596.46 monthly. It is evident that neither position provides substantially the same earning capacity as Scott’s prior position as a plumber/pipefitter at the University. Therefore, Scott remains disabled and entitled to disability benefits.

Penalty and attorney fees

Unum argues that the trial court was clearly wrong in finding that La. R.S. 22:1821 was violated and that a penalty and attorney fees were warranted.
Disability insurance is classified as health and accident insurance. La. R.S. 22:47(2)(a). La. R.S. 22:1821(A) provides:
All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent businessman on his guard, exist. The insurer shall make payment at least every thirty days to the assured during | isthat part of the period of his disability covered by the policy or contract of insurance during which the insured is entitled to such payments. Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney’s fees to be determined by the court.
This statute, formerly numbered La. R.S. 22:657, was discussed at length by the Third Circuit in Stewart v. Calcasieu Parish School Bd., 2005-1339, pp. 4-5 (La.App. 3d Cir.5/3/06), 933 So.2d 797, 801, writ denied, 2006-1910 (La.11/3/06), 940 So.2d 666:
An award of penalties and attorney fees under this statute serves as a punishment, and therefore must be applied with great care. “This section is penal in nature and is strictly construed. The burden is on the claimant to prove arbitrariness and capriciousness or lack of probable cause.”
The determination as to whether an insurer acted arbitrarily or capriciously is a fact-based analysis, and therefore cannot be overturned by an appellate court absent a finding of manifest error, or that the trial court was clearly wrong.
The party claiming entitlement to penalties and attorney fees bears the burden of proving that the insurer had sufficient proof that payment on a claim was due as a basis for establishing that *751 the insurer was arbitrary and capricious in denying the claim.
The determination of whether the insurer acted arbitrarily or capriciously must be based, at least in part, on the information known to the insurer at the time the claim was made. If the insurer has a good faith, reasonable explanation for its failure to timely pay on a claim, then the penalty provisions should not apply. Also, when a reasonable disagreement exists between an insurer and an insured, it is not arbitrary and capricious or without probable cause on the part of the insurer to deny payment on the claim that is in dispute. “Whether there are such just and reasonable grounds is a question of fact. The trial court’s findings of fact may not be disturbed on appeal absent manifest error.”
(Citations omitted.)
|19In the context of penalties and attorney fees in workers’ compensation proceedings, arbitrary and capricious behavior has been defined as willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation. See Brown v. Texas-LA Cartage, Inc., 98-1063 (La.12/1/98), 721 So.2d 885.
Michael Marley was the disability benefits specialist assigned to Scott’s claim. His job at Unum was to investigate and review disability claims. Marley consulted with registered nurse Amy Herrick regarding Scott’s claim.
Marley stated that even though Dr. Kouros felt in early 2007 that Unum needed additional information to fully evaluate Scott’s claim, Unum began paying benefits to Scott because Marley thought it was the right thing to do. The decision to pay benefits received medical support in March of 2007 after Dr. Kouros examined Scott’s medical records and found that Scott’s occupational demands were in excess of his reasonable functional capacity. This showed that Scott could not perform his regular occupation, so Marley recommended that the reservation of rights be removed.
Marley, Giese, an Unum clinical consultant, and an Unum quality compliance consultant met to discuss Scott’s claim as the initial benefits period of 24 months neared its end. They agreed that the restrictions and limitations in the FCE appeared reasonable and that Dr. Hubbard should be contacted to get his opinion about the FCE. Marley wrote to Hubbard in late October of 2008 asking that he help Unum evaluate Scott’s eligibility |gnfor continued benefits. Dr. Hubbard replied that he agreed that the restrictions and limitations outlined in the FCE were still valid for Scott.
Marley felt comfortable terminating benefits without having Scott evaluated by an orthopedist. Marley stated that Unum probably refrained from having Scott examined by an orthopedist because the doctors did not disagree about his physical condition. Unum was more concerned about his functionality, which is why the FCE was done.
When Scott was informed by Marley that his benefits would stop after 24 months because his physical condition did not disable him from any gainful occupation, he was told that although he could not work in his former occupation at ULM, the alternate occupations of security guard and gate guard had been identified.
Giese looked for occupations in the geographical area that paid about $8.47 per hour when he performed the occupational analysis. Giese did not do a labor market survey to determine if the security guard and gate guard positions were available. Giese never interviewed Scott, but he explained that this would have been neces *752 sary only if the question was whether Scott could work as a security guard. In this instance, Giese looked at the question as being whether there were other occupations that Scott could perform.
In Unum’s appeal process, no deference is given to the original decision. Karen Connolly was the Unum appeals specialist assigned to Scott’s claim. She conferred with Drs. Hill and Zimmerman, medical consultants for Unum in its internal appeals procedure.
|2iPr. Hill was a general practitioner with a focus on sports medicine. He concluded that the restrictions and limitations assigned to Scott were reasonable and supported and should be considered permanent.
Dr. Zimmerman, a psychologist and neu-ropsychologist, concluded that Scott’s medical records did not support impairment from a behavioral standpoint. Moreover, she did not find sufficient reason to disagree with Dr. Seiden’s opinion. She did not think that Scott was ever disabled by his mental condition.
Connolly stated that the grounds for finding that Scott was not disabled were the two alternative occupations identified by Giese. The alternative occupations were also mentioned in Marley’s termination letter to Scott.
Marley handled the matter as if it were controlled by federal law, at least insofar as he mentioned ERISA in the denial letter. He stated that he was never asked to reevaluate the claim under Louisiana law, and doing so would not have made a difference since he evaluated it based on the policy language. Connolly stated that she checked her manual to see if there were any applicable Louisiana regulations.
If Unum had examined its policy definition of disability in light of La. R.S. 22:990(C), it would have realized that its policy definition was illegally restrictive in that it did not take into account that the two identified alternative occupations would not provide Scott with substantially the same earning capacity as he had when he worked as a plumber and pipefitter. These two alternative occupations were the basis for terminating Scott’s 122benefits after the period of 24 months. . A simple resort to the statute would have made Unum aware that it needed to seek alternative occupations that offered Scott substantially the same earning capacity. Because it failed to do this, Unum acted arbitrarily and capriciously in terminating benefits. The trial court was not clearly wrong in ordering the payment of a penalty and attorney fees.
Unum next argues that the trial court erred in its calculation of the penalty and attorney fees. The penalty provision in La. R.S. 22:1821(A) states, “Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due[.]” Unum contends that this provision means that the total sum that can be awarded to Scott is the amount of the benefits due, plus a like amount as a penalty.
In support of its argument, Unum cites Crawford v. Blue Cross Blue Shield of Louisiana, 1999-2503 (La.App. 1st Cir.11/3/00), 770 So.2d 507, writ denied, 2000-3267 (La.2/16/01), 786 So.2d 98. The Crawford court concluded that under La. R.S. 22:657(A), before it was renumbered as La. R.S. 22:1821(A), the insured was entitled to a penalty award of 100% of the claim. In Nickels v. Guarantee Trust Life Ins. Co., 563 So.2d 924 (La.App. 1st Cir.1990), the First Circuit ruled that the “double the amount” provision did not mean double the amount of benefits as a penalty in addition to the amount of benefits; rather, it meant recovery of a total of *753 twice the amount of benefits due, or 100% of the benefits due as a penalty. See Fulton v. Blue Cross of Louisiana, 563 So.2d 492 (La.App. 4th Cir.1990), writ denied, 567 So.2d 1129 (La.1990); Bowers v. Sun Life Assur. Co. of Canada, 99-215 (La.App. 3d Cir.6/30/99), 768 So.2d 37, writ denied, 2000-1978 (La.10/6/00), 771 So.2d 82.
The argument that an insurer liable for penalties under La. R.S. 22:657 should be assessed with twice the amount of benefits due as a penalty in addition to the payment of the benefits was rejected by the Third Circuit in Bischoff v. Old Southern Life Insurance Company, 502 So.2d 181 (La.App. 3rd Cir.1987). Interestingly, an unrelated insurance statute, La. R.S. 22:1220 (now renumbered La. R.S. 22:1973), provides for a penalty “in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.” (Our emphasis.) The Louisiana Supreme Court has calculated penalties under this statute by doubling the amount of damages attributable to the insurer’s breach of duties under La. R.S. 22:1220. See Durio v. Horace Mann Ins. Co., 2011-0084 (La.10/25/11), 74 So.3d 1159, where the plaintiff was awarded damages of $167,333 and penalties of $334,666.
La. R.S. 22:1973 and La. R.S. 22:1821 are readily distinguished. The former provides in subsection (C), “In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties!)]”[7] The latter does not contain the “in addition to” language.
12,|We agree with the other circuits that have calculated penalties under La. R.S. 22:1821 and its predecessor, La. R.S. 22:657.[8] A penalty of double the amount of the benefits due means a penalty equal to 100% of the benefits due. Had the legislature intended the penalty to be 200% of the benefits due, it would have utilized language similar to that found in La. R.S. 22:1220 (now La. R.S. 22:1973). Accordingly, the trial court erred in calculating damages and attorney fees.
The penalty assessed against Unum is reduced to $23,478.96, or 100% of the benefits due. The attorney fees, which were based on a one-third contingency fee, are reduced to $15,652.64.
*754 DECREE
We amend the judgment to reduce the penalty assessed and the attorney fees awarded. As amended, the judgment is affirmed, at Unum’s costs.

. Unum’s personnel decided by March of 2007 that removal of reservation of rights was warranted.

. Although the disability period had commenced in September, benefits were not payable during an elimination period running from September 3 through December 1, 2006.

. Unum filed a notice of removal to federal district court in June of 2009. The case was remanded by the federal magistrate to state court in October of 2009. In January of 2010, the federal district court denied Unum’s appeal of the magistrate's removal decision.

. Scott testified that when he told Dr. Brown about his back in 2007, Dr. Brown asked him who his doctor was and then told him to return to Dr. Hebert.

. Dr. Hebert related that the MRI showed that Scott did not have a herniated disc, which Dr. Hebert never thought that Scott had. According to Dr. Hebert, a severely herniated disc would have made Scott a candidate for surgery.

. Dr. Hubbard also recommended that Scott see a psychiatrist.

. La. R.S. 22:1892 (formerly La. R.S. 22:658) contains similar language in subsection (B)(1): "a penalty, in addition to the amount of the loss[.]”

. Act 310 of 1910 was the precursor to La. R.S. 22:1821 and La. R.S. 22:657. It read, in pertinent part:
That the insurance company guilty of such delay in payment, unless upon just and reasonable grounds, shall pay to the assured, as a penalty, double the amount due under the terms of the policy or contract, during the period of delay, with attorney’s fees to be determined by the tribunal before whom suit is instituted.
Act 310 of 1910 was examined by the supreme court in Frey v. Manhattan Life Ins. Co. of New York, 182 La. 821, 162 So. 633, 637-8 (La.1935). After the insurer refused to pay disability benefits to Frey, Frey sued, and the trial court awarded benefits, but not penalties or attorney fees. The supreme court amended the judgment to award penalties and attorney fees. Regarding the measure of penalties, the court stated:
Counsel for plaintiff argue that the penalty alone for delay in making payments is double the amount due, or $20 per month for each $1,000 of insurance in addition to the amount stipulated in the policy. In other words, if plaintiff is entitled to the penalties, he should receive $30 per month or three times the amount stipulated in the policies. We do not so construe the statute. As a penalty for delay the insurer must pay, not the amount called for by the policies, but twice that amount, or $20 per month for each month during the delay, instead of $ 10 per month for each $1,000 of insurance.